# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| DEANDRE CRAWFORD, | ) |
| | ) |
| Plaintiff, | ) No. 16 C 04216 |
| | ) |
| v. | ) |
| | ) Judge Edmond E. Chang |
| WENDY DYBAS and | ) |
| WEXFORD HEALTH SOURCES, INC., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

During Ramadan of 2015, Plaintiff DeAndre Crawford was an inmate at Illinois' Stateville Correctional Center. Crawford alleges that Wexford Health Sources and one of its nurses, Wendy Dybas, were deliberately indifferent to his medical needs during Ramadan, because they only offered him his prescribed medications during daylight hours—while he was fasting and could not, for religious reasons, take the medications. R. 49, First Am. Compl.[1] Wexford and Dybas have moved for summary judgment, R. 78, arguing that no reasonable jury could find they were deliberately indifferent in violation of the Eighth Amendment. For the reasons explained below, the motion is granted as to Wexford and denied as to Dybas.

## I. Background

In deciding Wexford and Dybas's motion for summary judgment, the Court views the evidence in the light most favorable to Crawford, the non-moving party. *See*

---

[1]Citations to the record are noted as "R." followed by the docket number and the page or paragraph number. The Court has jurisdiction over this claim under 28 U.S.C. § 1331.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Crawford was an inmate in the custody of the Illinois Department of Corrections at the Stateville Correctional Center. R. 87, Pl.'s Resp. DSOF ¶ 1. At some point before June 2015, Crawford was diagnosed with seizures, hypertension, and bipolar disorder. R. 90, Defs.' Resp. PSOF ¶ 43. To treat those conditions, he was prescribed 750 milligrams of Divalproex (the brand name is Depakote) twice a day; 5 milligrams of Lisinopril (Zestril) once a day; and 100 milligrams of Sertraline (Zoloft) once a day. *Id.* at ¶¶ 43-44. Crawford practices the Muslim faith, and for at least several years, he has fasted during Ramadan. Defs.' Resp. PSOF ¶¶ 39-41; R. 80-3, Defs.' Exh. C, Crawford Dep. at 19:11-15. In 2015, Ramadan lasted from June 21 through July 17. Pl.'s Resp. DSOF ¶ 12. Crawford fasted during daylight hours on those days, and his fast required him not to take medications during those daylight hours. Defs.' Resp. PSOF ¶ 40; *see also* Crawford Dep. at 25:24-26:3 (testifying that Muslims are not allowed to take medications during daylight hours during Ramadan).

Wexford provides health care services at Stateville, and Dybas is a registered nurse who works for Wexford there. Pl.'s Resp. DSOF ¶¶ 2-3; R. 80-4, Defs.' Exh. D, Dybas Decl. ¶¶ 2-3; R. 80-6, Defs.' Exh. F, Fisher Decl. ¶ 3. During Ramadan of 2015, Wexford's nurses administered medication to Muslim inmates during the 11 p.m. to 7 a.m. shift so that the inmates could avoid taking their medications during fasting hours. Defs.' Resp. PSOF ¶ 47; Dybas Decl. ¶ 6. The names of inmates observing Ramadan were included on a list, which the 11 p.m. to 7 a.m. nurses used to pass out medications during their respective shifts. Defs.' Resp. PSOF ¶ 47; Dybas Decl. ¶ 6.

At the time, Dybas worked the shift that spanned 7 a.m. to 3 p.m., which was the shift that immediately followed the night-time shift. Pl.'s Resp. DSOF ¶ 14; Dybas Decl. ¶¶ 2-3.

According to Crawford, he did not receive medications during the 11 p.m. to 7 a.m. shift during Ramadan 2015. *See* Defs.' Resp. PSOF ¶ 48. He maintains that he complained about this to Dybas, as well as several other Wexford nurses. *Id.*; Crawford Dep. at 57:2-9, 99:16-24. He also explains that he refused medications offered to him during the day because he was fasting. Defs.' Resp. PSOF ¶ 48; Crawford Dep. at 80:23-81:11, 100:5-9; *see also id.* at 25:24-26:3.

Wexford's Medication Administration Record sheets (the parties call them "MARs sheets") for June and July 2015 show that Crawford frequently did not take his medications during Ramadan 2015. *See* R. 80-5, Defs.' Exh. E, Med. Records at 99-106. Here is how the MARs sheets work: each time a nurse offers medicine to a patient, she puts her initial in the box corresponding to that medication, date, and time. Pl.'s Resp. DSOF ¶ 21. If the patient refuses the medication, then she circles her initials. *Id.* Crawford points out that there actually are many reasons—not just an inmate's refusals—that might prompt a nurse to circle her initials to reflect that the inmate did not end-up taking the medication; the set of reasons is listed on the back of the sheets. *Id.*; *see* Med. Records at 99-106. But at the very least, a circled set of initials means that the patient did not take the medication at that date and time. Nurses do sometimes list the reason that a patient did not get his medication (whether the reason is the patient's refusal or some other issue) on the back of the

3

MARs sheet, and sometimes also include the particular reason for a patient's refusal. Pl.'s Resp. DSOF ¶ 21; *see e.g.*, Med. Records at 102, 106. Of course, Crawford disputes that the MARs records are always accurate. *See* Pl.'s Resp. DSOF ¶ 21 ("The nurse should circle the initials when medications are not administered for one of the six reasons, including refusal. Disputed as to whether that is always done.") (internal citations omitted).

For June 2015, Crawford's MARs sheet suggests that he did not take his morning medications on June 15, June 19, June 21, June 24, June 26, June 28, June 29, or June 30. Med. Records at 101. Those are the dates for which the nurses' initials seem to be circled. *Id*. On all but one of those dates (June 24) Crawford did take his *evening* administration of Divalproex. *Id*.

From July 1 through 21, Crawford missed his morning medications every day *except* July 3 and July 18-21. Med. Records at 105.[2] The explanation written on the back of the form for Crawford's rejection of his morning medications on July 8 says "Ramadan." *Id*. at 106. Crawford does not appear to have been offered morning medications at all on July 10-12—there are no initials in those boxes. *Id*. at 105; Defs.'

---

[2]The parties seem to count the number of circled initials differently. According to the Defendants, "Plaintiff did not receive his morning medications due to refusal or not being present in his cell on only nine (9) occasions." Defs.' Resp. PSOF ¶ 50. Crawford, on the other hand, reports missing his medications on 22 days of Ramadan. *See* R. 88, Pl.'s Resp. at 2. To the Court's eyes, there were 19 misses. It is possible that everyone is interpreting ambiguous markings differently; the initials and circles are quite small, and counting them requires interpreting the handwritten markings of several different nurses. Also, Crawford avers that the MARs sheet does not accurately represent his experience. *See* Pl.'s Resp. DSOF ¶ 21 (claiming that he did not receive his medications on June 22, even though the nurse's initials are *not* circled for that date). At this stage, the Court must view the facts in the light most favorable to Crawford, so the greater number of misses (something between 19 and 22) is the premise of this Opinion.

4

Resp. PSOF ¶ 51. But Crawford accepted his medications in the *evening* every day they were offered that month. Med. Records at 105.

Overall, Dybas's initials are recorded on Crawford's MARs sheet for only one day during Ramadan: June 27. Defs.' Resp. PSOF ¶ 44; Pl.'s Resp. DSOF ¶ 22; Med. Records at 101. On that day, it appears that Crawford accepted and took his morning medication. Pl.'s Resp. DSOF ¶¶ 24-25; Med. Records at 101.

Crawford alleges that he suffered "depression, seizures and mood swings as a result of skipping his medications." Defs.' Resp. PSOF ¶ 53; Crawford Dep. at 75:6-77:13. He also claims that he requested a crisis response team "several times." Defs.' Resp. PSOF ¶ 53. On July 6, 2015, he filed a grievance form with the IDOC's grievance office. *Id.* ¶ 54; *see* R. 87-1, Pl.'s Exh. A, Grievance Form.

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must "view the facts and draw reasonable inferences in the light most favorable to the" non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (cleaned up).[3] The Court "may not weigh conflicting evidence or

---

[3]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

make credibility determinations," *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (cleaned up), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

The Eighth Amendment "prohibits punishments [that] are incompatible with 'the evolving standards of decency that mark the progress of a maturing society.'" *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828-29 (7th Cir. 2009) (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)). "[D]eliberate indifference to serious medical needs of prisoners" violates the Eighth Amendment. *Estelle*, 429 U.S. at 104. Deliberate indifference can include "intentionally denying or delaying access to medical care or intentionally interfering with prescribed treatment." *Rodriguez*, 577 F.3d at 829. Determining whether a prison official's conduct violates the Eighth Amendment requires a two-step analysis, "first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether

6

the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727-28 (7th Cir. 2016).[4]

On the objective element, generally speaking "[a] medical need is sufficiently serious if the inmate's condition 'has been diagnosed by a physician as mandating treatment or … is so obvious that even a lay person would perceive the need for a doctor's attention.'" *Lewis v. McLean*, 864 F.3d 556, 563 (7th Cir. 2017) (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). A qualifying medical condition "need not be life-threatening." *Lewis*, 864 F.3d at 563. Instead, it "could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Id.* (cleaned up).

The subjective element of the standard requires that the defendant "knew of a substantial risk of harm to the inmate and disregarded the risk." *Greeno*, 414 F.3d at 653. It is not enough that the defendant was negligent. *Rodriguez*, 577 F.3d at 829; *see also Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019). Circumstantial evidence that might help prove subjective knowledge or subjective awareness includes "the obviousness of the risk from a particular course of medical treatment; the defendant's persistence in a course of treatment known to be ineffective; or proof that the defendant's treatment decision departed [] radically from accepted professional

---

[4]As a formal matter, the Eighth Amendment applies to state prison officials and those acting under color of state law via incorporation through the Fourteenth Amendment's Due Process Clause.

7

judgment." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662-63 (7th Cir. 2016) (cleaned up).

### A. Dybas

Dybas argues that she was not deliberately indifferent to Crawford's medical needs, primarily because she only dispensed morning medications to Crawford a *single* time during Ramadan. R. 79, Defs.' Br. at 7-9; *see* Med. Records at 101. And on that date—June 27—Crawford actually took his medications. Defs.' Br. at 7-9; *see* Med. Records at 101. But Crawford's remaining claim against Dybas is not that she herself refused to administer medication to him during Ramadan. Instead, it is that she did nothing in response to Crawford's complaint to her that he was *not* receiving medications before sunrise. R. 88, Pl.'s Resp. at 8 ("As a nurse, [Dybas] knew the dangers of skipping medications, and she also knew that there was a way of accommodating Plaintiff's Ramadan fasting schedule and she did nothing about it."). Dybas denies that Crawford informed her of the problem, but at the summary judgment stage, the Court must take Crawford's version as true (the jury might, of course, reject Crawford's assertion).

There are some circumstances in which the Eighth Amendment requires nurses to take active steps in responding to a prisoner's inadequate medical treatment. Consider *Berry v. Peterman*, 604 F.3d 435 (7th Cir. 2010). In *Berry*, the Seventh Circuit reversed a grant of summary judgment to a nurse who was aware of the significant pain a prisoner was experiencing in his tooth. 604 F.3d at 443. In *Berry*, the Seventh Circuit explained that a jury could reasonably find that the nurse

8

should not have, in the particular circumstances, simply deferred to the doctor, and perhaps should have raised the issue with the doctor or "other supervisory personnel to voice [] concerns" about the prisoner's condition—even though the doctor knew about the pain and had already declined to refer the prisoner to a dentist. *Id*. As relevant (but not dispositive) evidence, the Seventh Circuit cited the American Nursing Association's Code of Ethics, which admonished that "a nurse confronted with an inappropriate or questionable practice should not simply defer to that practice, but rather has a professional obligation to the patient to take appropriate action, whether by discussing the nurse's concerns with the treating physician or by contacting a responsible administrator or higher authority." *Id*. (cleaned up). Conversely, in *Rice ex rel Rice v. Correctional Medical Services*, the Seventh Circuit held that the nurse-defendants were not liable for failing to prevent a prisoner's death, in part, because of how much care they had already given him: they saw him "three or more times daily," "monitored his condition," "attempted to convince him to take his medications, and tried to get him to eat more." 675 F.3d 650, 683-84 (7th Cir. 2012).

Taking the evidence in the light most favorable to Crawford, this case is more like *Berry* than *Rice*: a reasonable jury could find that Dybas was deliberately indifferent to Crawford's medical needs after he complained to her and she did nothing (according to him). On the objective element, there apparently is no dispute that (1) Crawford had an objectively serious medical condition; and (2) failure to take the prescribed medications presented a serious health risk. Wexford and Dybas admit

9

that Crawford had been previously diagnosed with seizures, hypertension, and bipolar disorder, and that the medications he had been prescribed were intended to treat those conditions. Defs.' Resp. PSOF ¶ 43.[5] And the defense brief does not contest the objective element. *See generally* Defs.' Br.

On the subjective element, Crawford has presented evidence that Dybas knew that he was not receiving his prescribed medications during non-fasting hours—namely, his testimony that he told her so. Crawford Dep. at 57:2-9; 99:16-24; *see also* Defs.' Resp. PSOF ¶ 48. The defense denies this, asserting that there is no "documented instance" of Crawford making that complaint "in his medical records." Defs.' Resp. PSOF ¶ 48. Dybas's declaration (which was filed with the defense's opening brief, though after Crawford's deposition) does not specifically deny Crawford's assertion, but even if it did, the Court must credit Crawford's admissible testimony (he, of course, would have personal knowledge of an assertion like that) that he told her. *See* Crawford Dep. at 57:2-9; 99:16-24. Moreover, Crawford's grievance form states that he told several nurses (including "Nurse Wendy") that he was not receiving his medications at the proper time. Grievance Form at 2. A hearsay exemption or exception might apply to the statement on the form, *e.g.*, Fed. R. Evid. 803(4); in any event, it is not necessary to rely on this form in light of Crawford's

---

[5]To support the diagnoses, Crawford points to a page in his medical records that says that Crawford had been diagnosed with seizures, hypertension, and bipolar disorder. Defs.' Resp. PSOF ¶ 43, *citing* Med. Records at 1. But the page is labeled a "[s]ummary" of Crawford's medical condition and is not signed by a physician (it is signed by a licensed practical nurse). In any case, the Defendants do not contest the diagnoses, and they do not argue that Crawford has failed to present evidence of an objectively serious medical condition, so there is no need to evaluate this issue further.

deposition testimony. There is a genuine dispute of fact on whether Crawford told Dybas that he was not being offered medication during non-fasting hours.

There is also a dispute of material fact on what, if anything, Dybas did in response to that information, which also goes to the subjective element of the deliberate indifference test. Assuming Dybas indeed knew about Crawford's predicament, there is no evidence that she did anything about it (the defense disputes that she was told anything, *see* Defs.' Resp. PSOF ¶ 48, so it is not surprising that there is no evidence of her reacting to it). A reasonable jury could find that doing nothing qualifies as disregard of a serious health risk, in light of the number, prescribed frequency, and nature of the prescribed medications.[6] For example, Crawford argues that he suffered seizures and had to request crisis intervention because of the missed doses. Defs.' Resp. PSOF ¶ 53; Crawford Dep. at 75:6-77:13. And Dybas presumably knew that Crawford was supposed to take the Divalproex twice a day (it is listed twice on the MARs sheet, *see e.g.*, Med. Records at 101). Also, by the time that Dybas initialed Crawford's MARs sheet for June 27, the sheet showed—via the circled initials of other nurses—that he had already missed his morning medications at least three times during the first six days of Ramadan. Med. Records at 101. That was a change from earlier in June, when he almost always took his medications; pre-Ramadan, there are circles around the nurses' initials on June

---

[6]It is not clear that what expert-opinion evidence either Crawford or Dybas are in a position to offer at this point. Crawford apparently did not disclose an expert on the risks of missing his medications (and missing it for how many days, and which ones), nor did the defense. This uncertainty, which is just one example of the litigation risks remaining in the case, shows why both sides must very seriously consider settlement options going forward.

11

15 and June 19 only. *Id.*[7] So a jury could find that Dybas was subjectively aware of a serious health risk, but did nothing in response.

On a related note, the Defendants dispute whether Crawford suffered any harm as a result of the alleged failure to ensure that he was offered his medication during non-fasting hours. *See* Defs.' Resp. PSOF ¶ 53 ("Plaintiff's citation in support for his statement [that he suffered depression, seizures, and mood swings after skipping his medications] is his own deposition testimony. However, he is not qualified to give medical or psychiatric opinions regarding his diagnoses or a causal connection between medication and his symptoms."); *see also Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (requiring that the plaintiff show that the defendant's "indifference caused her some injury"). It is true that, in some circumstances, a patient does not have sufficient medical knowledge to link missed medication with some resulting harm. This is not that kind of case. Crawford's own account of the harm that he suffered is in line with the symptoms the medications were prescribed to treat, so his testimony must be credited at the summary judgment stage. *See* Crawford Dep. at 75:6-77:13. And there is other circumstantial evidence that

---

[7]The Defendants argue that Crawford had a habit of skipping his medications before and after Ramadan, as if to suggest that his fast was not the real reason for the number of days of medication he missed, or that it was somehow otherwise his fault he did not take his morning medication during Ramadan. R. 89, Defs.' Reply at 3 ("[T]o the extent that Plaintiff did not receive his medications to prescription, he is the most culpable party."). But even a quick glance at the MARs sheets for May, June, and July shows that Crawford's rate of missing morning medications increased substantially after Ramadan started. Med. Records at 99-106. And the Defendants' evidence about August and September could go either way— in light of the fact that Depakote and Zoloft are psychotropic medications, Defs.' Br. at 2, it is arguable that Crawford's alleged refusals after Ramadan were *caused* by missing medications *during* Ramadan, because his mental health had deteriorated.

12

supports Crawford's account: his diagnoses of seizures and bipolar disorder are serious ones, he did not receive his morning medications for many days during Ramadan, and the fact that he was prescribed the Divalproex twice per day suggests that the frequency with which he took it had significance. This is a close enough question that the jury must decide it.

For the same reasons, there are disputed issues of fact on whether her conduct was "motivated by evil intent" or "involve[d] reckless or callous indifference to [Crawford's] federally protected rights." *Smith. Wade*, 461 U.S. 30, 56 (1983); *see also Beard v. Wexford Health Sources, Inc.*, 900 F.3d 951, 955 (7th Cir. 2018). Punitive damages, thus, remain at issue and Dybas is not entitled to summary judgment on that claim either.

### B. Wexford

To hold a private corporation liable for violation of a prisoner's Eighth Amendment rights, the alleged injury must be "caused by a [] policy, custom, or practice of deliberate indifference to medical needs, or a series of bad acts that together raise the inference of such a policy." *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 796 (7th Cir. 2014); *see also Iksander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982) (applying *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978), to private corporations that act under color of law). A series of "isolated incidents" of

mistake or negligence do not necessarily "add up to a pattern of behavior that would support an inference of a custom or policy." *Shields*, 746 F.3d at 796.

Crawford alleges two different types of policies. First, his First Amended Complaint makes a general claim that "Wexford has a policy, practice, and/or [procedure of] denying inmates medications." First Am. Compl. ¶ 56. The Defendants, of course, deny this. Pl.'s Resp. DSOF ¶ 36 ("Wexford does not have any polic[y] or practice of denying care or medication to inmates simply related to costs."); *see also* Fisher Decl. ¶ 6 ("Wexford does not have any policy or practice of denying care or medication to inmates simply related to costs."). There is no evidence of a formal policy of this sort, and Crawford admits that he has never seen one in writing. Pl.'s Resp. DSOF ¶¶ 29-30. He offers no evidence of a formal policy, so this *Monell* theory does not support a claim against Wexford.

Second, Crawford argues that the 22 occasions (by his count) when he was not properly offered medications during Ramadan establish a sufficient pattern for *Monell* liability on their own. Pl.'s Resp. at 10 ("Failing to give Plaintiff his morning medications before the fasting began, not once or twice, but 22 times, was nothing short of a series of incidents of unconstitutional conduct.") (internal quotation omitted). But that argument does not work. *Monell* requires that a pattern give rise to an inference of a *widespread* practice or custom. *Shields*, 746 F.3d at 796 (explaining that "isolated incidents" are not enough). The fact that one inmate was allegedly not on Wexford's list of prisoners who would receive medications before daylight hours, or that one inmate was allegedly not responded-to when he

14

complained about the situation, is not enough evidence for a reasonable jury to find that Wexford had a *widespread* custom or practice of denying medication in this way. Indeed, given that Wexford *does* have a policy in place for providing medications to Muslim inmates during Ramadan, Pl.'s Resp. DSOF ¶¶ 16-17, the single-inmate evidence falls well short of creating a genuine issue. The Court must grant summary judgment in favor of Wexford on the *Monell* claim.

Finally, the Court notes that Crawford's response brief contends that he had intended to bring claims also under the First Amendment. Pl.'s Resp. at 6. Although it is true that leave to amend a complaint should be freely given when justice requires it, Fed. R. Civ. P. 15(a)(2), here, Crawford gave the defense *zero* notice of a First Amendment claim until his summary judgment response brief. R. 88; *see also* First Am. Compl. ¶ 1 (setting out claims under the Eighth and Fourteenth Amendments, without mentioning the First). At this point, well after the close of discovery, the Defendants would be severely prejudiced by the addition of a First Amendment claim and its different legal elements. To the extent that Crawford was seeking leave to amend the complaint (he did not actually propose an amended complaint), the request is denied.

## IV. Conclusion

For the reasons discussed, summary judgment is granted in favor of Wexford but denied as to Dybas. At noted earlier, the parties must engage in settlement negotiations. The status hearing of April 4, 2019 is reset to May 7, 2019, at 10:30 a.m., for an update on settlement negotiations and to set the trial schedule if needed.

The parties also may call the courtroom deputy in advance of the status hearing if they want a settlement referral to the magistrate judge.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 29, 2019